TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JENNIFER L. WAIER
Chief Assistant United States Attorney &
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture and Recovery Section
VICTOR A. RODGERS (Cal. Bar No. 101281)
Assistant United States Attorney
Asset Forfeiture and Recovery Section
1100 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-2569
Facsimile: (213) 894-6269
E-mail: victor.rodgers@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>$1,204,000.00 SEIZED FROM ONE EAST WEST BANK ACCOUNT, $842,490.00 SEIZED FROM ONE EAST WEST BANK ACCOUNT, $527,460.61 SEIZED FROM ONE JP MORGAN CHASE BANK ACCOUNT AND $488,275.57 SEIZED FROM ONE CATHAY BANK ACCOUNT,<br><br>Defendants. | Case No. 2:26-cv-10544<br><br>VERIFIED COMPLAINT FOR FORFEITURE<br><br>18 U.S.C. § 981(a)(1)(A) and (C)<br><br>[U.S.S.S.] |

Plaintiff United States of America brings this claim against defendants $1,204,000.00 Seized From One East West Bank Account,

$842,490.00 Seized From One East Wast Bank Account, $527,460.61 Seized From One JP Morgan Chase Bank Account and $488,275.57 Seized From One Cathay Bank Account (collectively, the "defendant bank funds"), and alleges as follows:

JURISDICTION AND VENUE

1. Plaintiff United States of America brings this in rem forfeiture action pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

2. This Court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this District pursuant to 28 U.S.C. §§ 1355 and 1395.

PERSONS AND ENTITIES

4. The plaintiff in this action is the United States of America.

5. The defendant bank funds in this action were seized by law enforcement officers on or about August 21, 2025 pursuant to a federal seizure warrant and consist of the following:

a. $1,204,000.00 Seized From One East West Bank Account, which funds were seized at East West Bank, 9300 Flair Drive, 4th Floor in El Monte, California from an account at East West Bank with the last four digits ending in 6226 and in the name of Ruizhi Zhang (the "East West Bank 6226 Account");

b. $842,490.00 Seized From One East Wast Bank Account, which funds were seized at East West Bank, 9300 Flair Drive, 4th Floor in El Monte, California from an account at East West Bank with the last four digits ending in 2670 and in the name of Nanxi Zhong (the "East West Bank 2670 Account");

c. $527,460.61 Seized From One JP Morgan Chase Bank, which funds were seized at JP Morgan Chase Bank, 725 South Figueroa Street in Los Angeles, California from an account at JP Morgan Chase Bank with the last four digits ending in 8313 and in the name of TCHN Engineer Inc. (the "Chase 8313 Account"); and

d. $488,275.57 Seized From One Cathay Bank Account, which funds were seized at Cathay Bank, 4128 Temple City Boulevard in Rosemead, California from an account at Cathay Bank with the last four digits ending in 3664 and in the name of Great Lands of America LLC (the "Cathay Bank 3664 Account").

6. The defendant bank funds are currently in the custody of the United States Secret Service in this District, where they will remain subject to this Court's jurisdiction during the pendency of this action.

7. The interests of Ruizi Zhang (as to defendant $1,204,000.00 Seized From One East West Bank Account only), Nanxi Zhang (as to defendant $842,490.00 Seized From One East Wast Bank Account only), TCHN Engineer Inc. (as to defendant $527,460.61 Seized From One JP Morgan Chase Bank only), Great Lands of America LLC (as to defendant $488,275.57 Seized From One Cathay Bank Account only), and victims V.W. (as to defendants $1,204,000.00 Seized From One East West Bank Account, $842,490.00 Seized From One East Wast Bank Account and $527,460.61 Seized From One JP Morgan Chase Bank only), J.F. (as to defendant $488,275.57 Seized From One Cathay Bank Account only) and H.H. may be adversely affected by these proceedings.

BASIS FOR FORFEITURE

8. The United States Secret Service (the "USSS") conducted an investigation involving a confidence fraud scheme, wire fraud, money

laundering and the transmission of fraud victim funds by an unlawful money transmitting business. As a result of the investigation, the USSS determined that the victims of the illegal activity had lost tens of millions of dollars due to the fraudsters' actions. Accordingly, plaintiff United States of America brings this action in order to return to the fraud victims at least some of the monies they lost, either in the instant judicial proceedings or the post-forfeiture extra judicial government remission process. The government does so in its effort to make sure the true victims of the fraud uncovered by the USSS--and not other persons who engaged in illegal activity in conjunction with the defendant bank funds and seek recovery of those funds solely for themselves and to the detriment of the fraud victims--receive the defendant bank funds to compensate those victims for at least a portion of the substantial losses they have suffered.

Background Regarding Confidence Fraud Schemes And The Use Of Digital Currency (Also Known As Cryptocurrency) In Those Schemes.

9. A confidence fraud scheme involves a victim transferring money or other assets as a result of being deceived or misled by a fraudster. Often a fraudster will deceive a victim into believing the fraudster and the victim have a close relationship--whether familial, friendly, romantic or otherwise--and will leverage that relationship to persuade the victim to send money, provide personal and financial information, purchase items of value or engage in other activity on the fraudster's behalf.

10. Victims of confidence fraud schemes frequently do not recognize they are being defrauded for many months or more, and sometimes never recognize they have been defrauded, because they are,

or believe they are, in a legitimate relationship with the person making the false claims or promises to them. Therefore, it is not uncommon for victims to send multiple wires and transfers to the same beneficiary or multiple beneficiaries over a period of time. Some victims of confidence fraud schemes are not completely truthful with, or seek to impede, law enforcement officers who question them about the money they have transferred, in part to protect the person the victims have been deceived into believing is their purported friend.

11. Sometimes digital currency, which is also known as cryptocurrency and virtual currency, is used in confidence fraud schemes. Digital currency is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency, which is currency created or regulated by a government. However, unlike fiat currency, digital currency has no physical form and instead exists entirely on the internet. In addition, digital currency is generated and controlled through computer software operating on a decentralized peer-to-peer network. Digital currency is often used for conducting illegal transactions or for concealing or disguising the true nature, source, location, ownership, or control of illegally obtained criminal proceeds. Bitcoin is one of the most commonly used digital currencies. Other types of digital currencies are Tether (also known as USDT) and Ethereum.

12. Digital currency is stored in a virtual account called a wallet. Wallets generate and store public and private keys used to send and receive digital currency. A public key or wallet address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user to access and transfer value associated with the public key or wallet address. In order to

conduct transactions, an individual must use both the public key or wallet address and the private key.

13. A digital currency exchange is a brick-and-mortar or online business that allows customers to trade digital currencies for fiat currencies or other digital currencies. Most digital currency exchanges are located outside the United States in order to avoid regulation and legal requirements. Coinbase, which operates in the United States, is one of the largest and most popular digital currency exchanges. Binance is also a well known digital currency exchange.

<u>The Background Regarding Unlicensed (And Therefore Unlawful) Money Transmitting Businesses.</u>

14. 18 U.S.C. § 1960 makes it a crime to knowingly conduct, control, manage, supervise, direct or own all or part of an unlicensed money transmitting business. Pursuant to 18 U.S.C. § 1960(b)(3), the term money transmitting "includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile or courier[.]"

15. 18 U.S.C. § 1960(b)(1)(A) defines an unlicensed money transmitting business as including one that affects interstate or foreign commerce and "is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor under State law, whether or not the business operator knew that the operation was required to be licensed." In California, money transmitters are required to be licensed. <u>See</u> Cal. Fin. Code § 2000, <u>et</u> <u>seq.</u>, including Cal. Fin. Code § 2030.

16. 18 U.S.C. § 1960(b)(1)(B) also includes within the definition of an unlicensed money transmitting business one that fails to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330, or the regulations thereunder (including 31 C.F.R. § 1022.380(a), which require money transmitting businesses to register with the U.S. Secretary of the Treasury via the Department of the Treasury's Financial Crimes Enforcement Network bureau ("FinCEN").

17. Furthermore, money transmitting businesses are considered money services businesses (see 31 C.F.R. § 103.11) and are therefore required under 31 C.F.R. §§ 1010.306 and 1010.311 to file Form 104 Currency Transaction Reports ("CTRs") with the FinCEN for each deposit, withdrawal, exchange of currency, or other payment or transfer, by, through, or to the money services business that involves more than $10,000.00 in currency, which filing must occur within fifteen days of the currency transaction. Also, money services business must comply with other anti-money laundering regulations, including those requiring the filing of Form 8300 Reports of Cash Payments Over $10,000.00 received in a Trade or Business, which identify persons involved in large currency transactions. See 31 C.F.R. § 1010.330. These requirements are anti-money laundering protections designed to uncover transactions involving the transmission of monies originating from unlawful sources.

18. Any property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1960, or any property traceable thereto, is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A). In addition, 18 U.S.C. § 981(a)(1)(C) renders

subject to forfeiture any property constituting or derived from proceeds traceable to violations of 18 U.S.C. § 1960, or a conspiracy to violate the statute.

The Law Enforcement Investigation In This Case.

19. As a result of the investigation, the USSS learned the information set forth below.

The Confidence Fraud Scheme Committed As To Victim V.W. Includes Wires Of Funds To Great Lands of America LLC Bank Accounts.

20. When law enforcement officers spoke with V.W. in July 2025, V.W. told officers the following. On December 25, 2024, V.W. received an unsolicited message on Nextdoor, an online app. The individual that sent the message identified herself as "Amy Huang" and told V.W. (a male) she contacted V.W. because she saw on V.W.'s profile V.W. was from California and she wanted information on the State in the event she decided to move to California. In addition, Huang told V.W. she was originally from China and currently lived in Long Island, New York.

21. Between December 25, 2024 and June 2025, V.W. and Huang communicated via WhatsApp, which is a messaging app allowing people to communicate using their telephone's internet connection. V.W. considered the relationship between Huang and himself as a friendship; their communications were often about their families and careers. During these communications, Huang identified her street address in New York. However, as of the time V.W. spoke with officers in July 2025, V.W. believed that the address given by Huang was fake because V.W. had once mailed a card to that location but that card had been returned to V.W. as undeliverable.

22. In February 2025, Huang told V.W. she worked for a company owned by Huang's aunt that employed approximately eighty people and specialized in analyzing investment trends in stocks, bonds and cryptocurrency. During one conversation, Huang asked V.W. whether V.W. invested in cryptocurrency and told V.W. she could provide trading advice to V.W. that would allow V.W. to earn greater than 20% returns using short-term trading strategies. Initially, V.W. was hesitant to invest but was thereafter convinced by Huang that investing with Huang would earn him better returns than traditional stocks.

23. With respect to the investments, Huang instructed V.W. to first open an account at the digital currency exchange Coinbase and use the account to purchase Tether cryptocurrency. Once that was accomplished, Huang advised V.W. to open an account at a website called Btchkle.com and transfer the Tether from Coinbase to Btchkle.com. Based on Huang's instructions, V.W. made his first investment, which totaled $100,000.00. Huang instructed V.W. as to the trades V.W. should make, and V.W.'s first trade appeared to have generated V.W. a 20% return, but V.W. later learned he did not receive the 20% return or any return on his $100,000.00 investment.

24. Because V.W.'s initial investment appeared to result in a 20% return, V.W. felt confident in the process and made a second investment of $100,000.00 using the same process as before, based on Huang's instructions. V.W. sent the second $100,000.00 to V.W.'s Coinbase account to purchase Tether, and then transferred the Tether to a cryptocurrency wallet at Btchkle.com. After the transfer to Btchkle.com, V.W.'s account balance at Btchkle.com reflected a $20,000.00 profit on the second $100,000.00 investment. However,

V.W. later learned that, like his first $100,000.00 investment, he did not receive the 20% return or any return on his second $100,000.00 investment.

25. After V.W. appeared to have earned $20,000.00 on both of V.W.'s $100,000.00 investments, Huang then told V.W. he could double his investment returns if V.W. invested a minimum of $5 million. In order to come up with those funds, Huang stated she would invest $1.7 million of her own and her friends' funds. Because of Huang's representations, including that she would invest $1.7 million of her own and her friends money (which later turned out to be untrue), V.W. paid the remaining $5 million by transferring $3,279,894.00 to various accounts as directed by a chat message application for customer service on the Btchkle.com website (i.e., the website Huang directed to transfer the Tether purchased using Coinbase) containing account and routing numbers) for the transfer.

26. More specifically, the $3,279,894.00 sent by V.W. consisted of $533,000.00 V.W. wired on February 13, 2025 to the Chase 8313 Account from which the government seized defendant $527,460.61; wires totaling $1,899,894.00 to an account associated with Coinbase which was maintained at Cross River Bank, was in the name of Fortress Trust, LLC and with the last four digits ending in 1937, consisting of $699,900.00, $599,996.00 and $599,998.00 wired on April 2, 21, and 22, 2025, respectively; and $847,000.00 V.W. wired on May 8, 2025 to an account at CTBC bank with the last four digits ending in 3108 and in the name of Great Lands of America LLC.

27. A few weeks after making the final investment, V.W. checked and found his account balance was over $16 million. (However, V.W. later learned, once again, that the depicted balance amount was

untrue). Because of the large apparent investment return, V.W. decided to withdraw the funds from his account on the Btchkle.com website. However, when V.W. attempted to do so, V.W. was told by a customer service representative that his account was flagged for suspicious insider trading and possible money laundering activity. In addition, V.W. was told that V.W. would have to pay $1,658,000.00 as a risk deposit fee in order to unfreeze and thereby withdraw the funds from his account.

28. V.W. paid the $1,658,000.00 by wiring $1,258,000.00 on May 23, 2025 to an account at CTBC Bank in the name of Great Lands of America LLC and $400,000.00 on June 11, 2025 to the Cathay Bank 3664 Account in the name of Great Lands of America LLC from which the government seized defendant $488,275.57. After V.W. made those payments, V.W. was told that his account was unfrozen. Accordingly, V.W. attempted to withdraw his cryptocurrency, by providing a customer service representative on the Btchkle.com website V.W.'s Coinbase wallet address for the transfer of the balance of cryptocurrency in V.W. account.

29. However, after a few days, V.W. had not received the cryptocurrency in his Coinbase wallet. Accordingly, V.W. contacted a customer service representative on the Btchkle.com website. The representative told V.W. that V.W. had provided an incorrect cryptocurrency wallet address, Btchkle.com had sent the funds to the incorrect address, and the funds could not be returned.

30. After a few more days passed, V.W. received messages from a Btchkle.com representative concerning the cryptocurrency, which advised that the representative could help recover the cryptocurrency transferred to the incorrect wallet address, but, in order to do so,

V.W. would need to pay a risk tax of approximately $1.8 million. At this point, V.W. had no more money, no additional sources of money to tap, and realized he was a victim of fraud. V.W. did not pay the risk tax fee, and reported the incident to law enforcement.

31. As a result of the fraud, victim V.W. paid in excess of, and therefore suffered losses exceeding, 5.5 million dollars. Some (but not all) of the funds which V.W. paid are set forth above.

The Confidence Fraud Scheme Committed As To Victim J.F. Includes Wires Of Funds To Great Lands of America LLC Bank Accounts.

32. When officers spoke with victim J.F. in July 2025, J.F. told them the following. In May 2025, J.F. wanted to invest in cryptocurrency and looked online for a cryptocurrency trading platform. After looking at a few trading sites, J.F. decided to use a platform called bidpanda.com, and downloaded the app. In order to conduct cryptocurrency trades, J.F. received trading instructions from a customer service representative on the bidpanda.com website who would advise him when to buy and sell cryptocurrency and told J.F. that J.F.'s trades would always be selling at the high price and buying back at a lower price.

33. J.F.'s first investment was for $480,000.00, which he made by wire transferring those funds to his account associated with Coinbase which was maintained at Cross River Bank with an account number ending in 9867. Using his Coinbase account, J.F. purchased Ethereum cryptocurrency, which J.F. converted to Tether cryptocurrency because bidpanda.com only accepted Tether on bidpanda.com's trading platform. A few weeks after making this investment, J.F. was surprised to learn his bitpanda.com account

balance was, according to the information from bitpanda.com, worth $1.4 million.

34. Because the bitpanda.com information reflected that J.F. had made approximately $1 million in profit from his $480,000.00 investment, J.F. attempted to withdraw $700,000.00 of his funds. However, J.F. was told by a bitpanda.com representative that J.F. would need to pay $642,000.00 for the tax on J.F.'s profits, in order to withdraw the funds. When J.F. asked whether the $642,000.00 could be taken out of his account balance, J.F. was told by the bitpanda.com representative that J.F. would need to send new funds.

35. As a result, on June 18, 2025, J.F. wired $642,000.00 to the Cathay Bank 3664 Account in the name of Great Lands of America LLC, and did so by taking funds out of J.F.'s retirement account. A few days after sending the $642,000.00 wire, J.F. again tried to withdraw $700,000.00 from J.F.'s bitpanda.com account. However, J.F. was told that J.F. would need to pay a 20% profit fee in order to make the withdrawal. Again, J.F. asked for the fee to be taken out of his bitpanda.com account balance, but again was told by a bitpanda.com representative that J.F. would need to send new money to make the payment. At this point, J.F. realized that J.F. was a victim of fraud and would not get his funds returned.

36. A few weeks after concluding he was a victim of fraud, J.F. was contacted by a person named Oliver who advised he could help get J.F.'s funds returned and claimed he (Oliver) was a recovery specialist with a specialty in loss recovery of cryptocurrency investments. J.F. decided to hire Oliver, and about one week later Oliver told J.F. that Oliver had hacked into J.F.'s bitpanda.com account and located $1.4 million of J.F.'s cryptocurrency. Oliver

also told J.F. that J.F. needed to pay $30,000.00 before Oliver could recover the funds. J.F. agreed to pay the fee and transferred $30,000.00 in cryptocurrency to a bitcoin wallet address provided by Oliver.

37. A few days later, Oliver contacted J.F. and told J.F. that bidpanda.com had seven layers of encryption security and Oliver was only able to hack four of the layers. Oliver then requested another $30,000.00 payment, which Oliver stated would be used to purchase a special hacking software to bypass the remaining three layers of security. At this point, J.F. was out of funds, unable to send additional funds, and suspected that Oliver was also scamming J.F. out of J.F.'s funds and was most likely working with the same individuals from the bidpanda.com scam who had fraudulently obtained J.F.'s funds.

<u>The Confidence Fraud Scheme Committed As To Victim H.H. Includes Wires of Funds To Great Lands of America LLC Bank Accounts.</u>

38. Law enforcement officers spoke with victim H.H. on January 9, 2026, who told officers the following. In June 2024, H.H. received an unsolicited text message in Line, which is a free messaging application that operates like WhatsApp, from an individual who went by the name Jess Feng. Between June and December 2024, H.H. and Feng communicated on a regular basis, often discussing hobbies and interests.

39. During a conversation in around January 2025, Feng stated that H.H. could earn significant returns by investing in cryptocurrency. As a result of their communications over the preceding six months, H.H. trusted Feng and decided to invest. Feng directed H.H. to first obtain a Trust Wallet account which would be

used to store cryptocurrency, and then register for an account at the website Alphablockers.com. Based on Feng's review of the website, H.H. learned there were different levels of investments; the more funds you invested, the higher tier you would join and the greater profits you would obtain. H.H. opened an account at Coinbase and wired $50,000.00 on January 29, 2025 and $1,000,000.00 on February 5, 2025 from his JP Morgan Chase account to the Coinbase account to purchase cryptocurrency.

40. H.H. then transferred the purchased cryptocurrency to his Trust Wallet account. From there, H.H. transferred the cryptocurrency to multiple wallet addresses at his Alphablockers.com account. H.H. did not inquire why he was required to send the cryptocurrency to multiple wallet addresses at Alphablockers.com.

41. In addition to the cryptocurrency transfers from Coinbase to Alphblockers.com, between February and June 2025, H.H. invested approximately $8 million by wire transferring funds to different banks, some of which were located overseas, as directed by customer representatives at the Alphablockers.com website who provided the banking information for the wires. In July 2025, H.H. checked his balance on the Alphablockers.com website and learned that his account balance was approximately $58 million. (However, H.H. later learned that the account balance amount was false).

42. H.H. then attempted to withdraw his account balance. In response, an Alphablockers.com customer service representative told H.H. that H.H. would have to pay a profit sharing fee. After H.H. paid that fee, H.H. was then told he would have to wait approximately two years to have H.H.'s funds returned due to others requesting withdrawals. The customer representative told H.H. that H.H. could

cut in front of the line if H.H. paid another fee. H.H. paid that fee, but when H.H. requested the funds, H.H. was told he would need to pay another fee.

43. In total, H.H. paid approximately $3.5 million in fees. After paying the profit sharing and cut-in-front-of-line fees, H.H. concluded he was a victim of fraud. In addition, the Alphablockers.com customer representative told H.H. that H.H.'s account would be frozen until H.H. paid the additional fees.

44. H.H. paid a total of $11.5 million from H.H.'s JP Morgan Chase account in wire transfers to fund his Alphablockers.com account, including $5.2 million in payments to Great Lands of America LLC accounts between May 16 and June 24, 2025 and a $1,000,000.00 payment on July 3, 2025 to Ruizhi Zhang's East West Bank 5053 Account.

45. H.H. reported his case to law enforcement officers in November 2025.

Ruizhi Zhang and Nanxi Zhong Use Their Realtor Xi Dai's (aka Daisy Dai's) Company Great Lands of America LLC's Accounts To Receive United States Dollars In Exchange For Ruizhi Zhang and Nanxi Zhong's Chinese RMB/Yuan Via Illegal Unlicensed Money Transmission Business And Money Laundering Transactions, In Ruizhi Zhang and Nanxi Zhong's Attempt To Purchase A Ten Million Dollar California Estate.

46. As of May 2025, Ruizhi Zhang and Nanxi Zhong desired to purchase a ten million dollar California home, but they lacked sufficient United States dollars to do so and took steps to transfer their Chinese currency, which is Renminbi ("RMB") or Yuan, to the

United States for the purchase. However, the People's Republic of China has laws and regulations which place restrictions on its citizens as to the amount of RMB they can transfer annually from China to other countries, such as the United States. The annual transfer limit is the RMB-equivalent of $50,000.00 in United States dollars. Exceeding the $50,000.00 limit requires approval from the responsible government agency.

47. In addition, China has laws and regulations prohibiting the transfer of any amount of RMB to the United States for the purchase real property in the United States. Those laws and regulations require China citizens to obtain approval for the purchase from the appropriate government agency, before proceeding with the purchase. As part of the approval process, relevant information concerning the real property purchase transaction must be provided via a written application, including the source of the RMB which will be used for the purchase, the purchase agreement and identification documents for the individuals.

48. Absent approval from the agency and satisfying other requirements, the transfer of the RMB-equivalent of $50,000 or more in United States dollars from China to the United States, or the purchase of real property in the United States with RMB, violates China laws and regulations. Violations of those laws and regulations subject the violator(s) to significant fines, account freezes and potential criminal exposure.

49. Rather than follow the authorized path to purchase United States real property or to exceed the annual maximum RMB transfer limits, Ruizhi Zhang and Nanxi Zhong engaged in transactions designed to avoid the China laws and regulations, which directly resulted in

the fraud victims mentioned above losing their funds. In order to acquire United States dollars in the United States to purchase the ten million dollar California home, Ruizhi Zhang and Nanxi Zhong hired Xi Dai (also known as Daisy Dai) as their realtor, money exchanger and agent to locate a California home and exchange Ruizhi Zhang and Nanxi Zhong's RMB situated in China for United States dollars situated in the United States, so that Ruizhi Zhang and Nanxi Zhong could use the United States dollars to purchase the home.

50. In order to evade the government restrictions, some Chinese nationals employ third parties to act as informal currency exchange networks, such as Daisy Dai, that are not legally authorized to act as currency exchangers to exchange the Chinese nationals' Chinese RMB from their mainland China financial accounts for an equivalent amount of United States dollars, from unknown individuals, transferred into the Chinese nationals' United States-based financial accounts. The United States dollars obtained from unknown sources often consist of criminal proceeds derived from fraud schemes or drug trafficking.

51. As Daisy Dai, Ruizhi Zhang and Nanxi Zhong, as well as Aki Zhou (discussed below) knew, the exchange would largely be conducted outside normal banking channels. Openly disclosing the full extent of the transactions would reveal to China and United States banking authorities and government agencies that the transactions were designed to conceal that the transactions' substance was to illegally transfer RMB directly into the United States.

52. When officers spoke with Daisy Dai on December 17, 2025, she told officers the following. In early 2025, Daisy Dai was introduced to the married couple Ruizhi Zhang and Nanxi Zhong. Daisy Dai was a realtor and assisted Ruizhi Zhang and Nanxi Zhong in

purchasing a home in California. Ruizhi Zhang and Nanxi Zhong told Daisy Dai they needed assistance in getting money from their bank in China and converted to United States dollars to purchase the home in California. In addition, Daisy Dai understood that China had a currency amount restriction limit as to how much funds could be transferred from China to other countries.

53. In 2024, Daisy Dai learned about a female Vancouver, Canada resident named Aki Zhou. Daisy Dai never met Aki Zhou in person but instead communicated with Aki Zhou only on WeChat. Aki Zhou purchased and sold Tether cryptocurrency, and had clients interested in purchasing Tether cryptocurrency. The transactions whereby Ruizhi Zhang and Nanxi Zhong RMB was exchanged for United States dollars worked as follows: Aki Zhou's clients would wire funds to Daisy Dai's Great Lands of America LLC bank account, Aki Zhou would then send an amount of cryptocurrency equivalent to the amount of wired funds less a fee from Aki Zhou's cryptocurrency wallet to the cryptocurrency wallet of Aki Zhou's client, Daisy Dai would then wire the funds she received in her Great Lands of America LLC bank account to Ruizhi Zhang and Nanxi Zhong's East West Bank accounts in the United States, and Ruizhi Zhang and Nanxi Zhong would then wire an equivalent amount of RMB from their bank account in China to a bank account held by a different person at a different bank in China.

54. After these United States dollars for RMB transactions had taken place, and as to all her clients (including Ruizhi Zhang and Nanxi Zhong) clients[1] for which Aki Zhou and Daisy Dai engaged in

[1] Those other clients of Aki Zhou and Daisy Dai would include victim H.H., discussed in paragraphs 38 to 45 above and J.F., discussed in paragraphs 32 to 37 above. H.H. wired $1.1 million and $2.4 million on May 16 and 25, 2025, respectively into Daisy Dai's

*(footnote cont'd on next page)*

this money transmitting activity, Aki Zhou would forward to Daisy Dai Aki Zhou's text message exchanges with her (Aki Zhou's) clients which showed the amount of Tether being purchased, the name and address of the purchaser and the amount the client sent to Daisy Dai. Based on information supplied by Aki Zhou, Daisy Dai would prepare and provide various documents to Aki Zhou, who would in turn have her (Aki Zhou's) client sign the documents. The client would then return the signed documents to Daisy Dai.

55. The Daisy Dai/Ruizhi Zhang and Nanxi Zhong transactions occurred as set forth below. On or about May 8, 2025, and using Daisy Dai as their agent, Ruizhi Zhang and Nanxi Zhong made a written offer to purchase a home in Newport Coast, Orange County, California for $9,280,000.00 in all cash in United States dollars, with an initial $278,000.00 deposit (3% of the purchase price) and a July 19, 2025 escrow closing date. On or about May 12, 2025, the owner of the Newport Coast property made a written counteroffer to sell the real property for $10,488,000.00 in all cash in United States dollars, with an initial deposit of $314,640.00 (3% of the purchase price) and an August 8, 2025 escrow closing date. On May 16 and 20, 2025, Ruizhi Zhang and Nanxi Zhong accepted the counteroffer by signing it, thereby agreeing to purchase the Newport Coast property for $10,488,000.00 in all cash in United States dollars.

56. Daisy Dai's company was Great Lands of America LLC, which Daisy Dai used on behalf of Ruizhi Zhang and Nanxi Zhong to convert RMB in Ruizhi Zhang and Nanxi Zhong's bank accounts in China into United States dollars for the purchase of the Newport Coast property.

---

Great Lands of America LLC's BMO Bank 9530 account and $1.7 million on June 24, 2025 into Daisy Dai's Great Lands of America LLC's Cathay Bank 3664 account.

As set forth below and as discussed above, victims V.W. and J.F. transferred their funds, which were United States dollars, into Great Lands of America LLC's bank accounts as follows:

| 2025 Date | Victim | Amount | Grt. Lands of Amer. Recipient Acct |
|---|---|---|---|
| May 8 | V.W. | $847,000.00 | CTBC Bank 3108 Account |
| May 23 | V.W. | $1,258,000.00 | CTBC Bank 3108 Account |
| June 11 | V.W. | $400,000.00 | Cathay Bank 3664 Account |
| June 18 | J.F. | $642,000.00 | Cathay Bank 3664 Account |
| Total | | $3,147,000.00 | |

In addition, as set forth below and as discussed above, Great Lands of America LLC transferred victim V.W. and J.F.'s monies to Ruizhi Zhang and Nanxi Zhong's accounts as follows:

| Date | GLA Account | Amount | Recipient Account |
|---|---|---|---|
| May 12 | 3108 Account | $842,000.00 | N. Zhong East West Bank 2670 Acct. |
| May 28 | 3108 Account | $835,000.00 | R. Zhang East West Bank 5053 Acct. |
| June 16 | 3664 Account | $369,000.00 | R. Zhang East West Bank 5053 Acct. |
| Total | | $2,046,000.00[2] | |

57. However, $2,046,000.00 in United States dollars was not sufficient for Ruizhi Zhang and Nanxi Zhong to pay in all cash (i.e., in United States dollars) the ten million dollars required to purchase the California residence by the August 8, 2025 escrow closing date. Accordingly, Ruizhi Zhang and Nanxi Zhong engaged in additional transactions.

58. Specifically, Ruizhi Zhang and Nanxi Zhong received additional United States dollars from yet another fraud victim, H.H.,

[2] As set forth in paragraph 5 above, the government seized this amount ($2,046,000.00) from the accounts to which the victim funds in the East West 5053 account were transferred, i.e., $1,204,000.00 seized from Ruizhi Zhang's East West Bank 6226 Account and $842,490.00 seized from Nanxi Zhong's East West Bank 2670 Account.

who wired $1,000,000.00 in United States dollars directly into Ruizhi Zhang's East West Bank 5053 account on July 3, 2025. Moreover, fraud victim H.H. wired an additional $5.2 million to Great Lands of America LLC, as set forth below, some or all of which the government suspects Great Lands of America LLC in turn sent to Ruizhi Zhang and Nanxi Zhong to help them purchase the ten million dollar California estate. The $5.2 million in wires were as follows:

| Date | Victim | Amount | Grt. Lands of Amer. Recipient Acct |
| --- | --- | --- | --- |
| May 16 | H.H. | $1,100,000.00 | BMO Bank 9530 Account[3] |
| May 25 | H.H. | $2,400,000.00 | BMO Bank 9530 Account |
| June 24 | H.H. | $1,700,000.00 | Cathay Bank 3664 Account |
| Total | | $5,200,000.00 | |

59. The California Department of Financial Protection and Innovation is the California agency responsible for issuing licenses for businesses that desire to operate as money transmitting businesses in California. However, the California Department of Financial Protection and Innovation Oversight Directory of Money Transmitters' records do not reflect Great Lands of America LLC, Daisy Dai or Aki Zhou as licensed money transmitting businesses in California as of the time of the above-referenced transactions. Likewise, federal FinCEN records do not reflect that Great Lands of America LLC, Daisy Dai or Aki Zhou were registered with the U.S. Department of Treasury as licensed money transmitting businesses when the above-referenced transactions took place. Accordingly, at the

[3] Daisy Dai advised officers she opened two Great Lands of America LLC accounts, one at Cathay Bank and the other at CTBC Bank, in the name of Great Lands of America LLC. However, the 9530 account is a third account, this one at BMO Bank in the name of Great Lands of America LLC and with the last four digits ending in 9530.

time of the transfers set forth below, neither Daisy Dai, Great Lands of America LLC nor Aki Zhou were authorized to function in California or under federal law as a money transmitting business. Therefore, the transmissions violated 18 U.S.C. § 1960.

Tracing Of Victim V.W. and J.F.'s Funds To The Defendant Bank Funds.

$1,204,000 Seized From One East West Bank Account with the last four digits ending in 6226 and In the Name of Ruizhi Zhang (the East West Bank 6226 Account)

60. As set forth above, on or about August 21, 2025, the government seized defendant $1,204,000.00 from the East West Bank 6226 Account in the name of Ruizhi Zhang. The tracing path supporting the seizure is set forth below.

61. On May 23, 2025, V.W. wired $1,258,000 to an account with the last four digits ending in 3108 at CTBC Bank and in the name of Great Lands of America LLC. On May 28, 2025, $835,000.00 (out of V.W.'s $1,258,000.00) was wired from the Great Lands of America LLC's 3108 account to an account at East West Bank with the last four digits ending in 5053 and in the name of Ruizhi Zhang (the "East West Bank 5053 Account"). On June 11, 2025, V.W. wired $400,000.00 to the Cathay Bank 3664 Account (i.e., the account with the last four digits ending in 3664 and in the name of Great Lands of America LLC). On June 16, 2025, $369,000.00 (out of V.W.'s $400,000.00) was wired from the Cathay Bank 3664 Account to the East West Bank 5053 Account. Accordingly, as of June 16, 2025, $1,204,000.00 ($835,000.00 + $400,000.00) of V.W.'s funds were situated in the East West Bank 5053 Account.

62. On July 1 and 8, 2025, a total of $1,846,896.00 (which included $1,204,000.00 of V.W.'s funds) was transferred from the East

West Bank 5053 Account to the East West Bank 6226 Account (i.e., the account at East West Bank with the last four digits ending in 6226 and in the name of Ruizhi Zhang), consisting of $838,896.00 sent on July 1, 2025 and $1,008,000.00 sent on July 8, 2025. The government seized defendant $1,204,000.00 from the East West Bank 6266 Account on or about August 21, 2025.

$842,490.00 Seized From One East West Bank Account with the last four digits ending in 2670 and In the Name of Nanxi Zhong (the East West Bank 2670 Account)

63. As set forth above, on or about August 21, 2025, the government seized defendant $842,490.00 from the East West Bank 2670 Account in the name of Nanxi Zhong. The tracing path supporting the seizure is set forth below.

64. On May 8, 2025, V.W. wired $847,000.00 to an account with the last four digits ending in 3108 at CTBC Bank and in the name of Great Lands of America LLC. On May 12, 2025, $842,000.00 was sent from the Great Lands of America LLC 3108 account to the East West Bank 2670 account (i.e., the account at East West Bank with the last four digits ending in 2670 and in the name of Nanxi Zhong). The government seized defendant $842,490.00 from the East West Bank 2670 Account on or about August 21, 2025.

$527,460.61 Seized From One JP Morgan Chase Bank Account with the last four digits ending in 8313 and In the Name of TCHN Engineer Inc. (the Chase 8313 Account)

65. As set forth above, on or about August 21, 2025, the government seized defendant $527,460.61 from the Chase 8313 Account (i.e., the account at JP Morgan Chase Bank with the last four digits

ending in 8313 and in the name of TCHN Engineer Inc.). The tracing path supporting the seizure is set forth below.

66. On February 13, 2025, V.W. wired $533,000.00 to the Chase 8313 Account. The government seized defendant $527,460.61 from the Chase 8313 Account on or about August 21, 2025.

$488,275.57 Seized From One Cathay Bank Account with the last four digits ending in 3664 and In the Name of Great Lands of America LLC (the Cathay Bank 3664 Account)

67. As set forth above, on or about August 21, 2025, the government seized defendant $488,275.57 from the Cathay Bank 3664 Account (i.e., an account at Cathay Bank with the last four digits ending in 3664 and in the name of Great Lands of America LLC). The tracing path supporting the seizure is set forth below.

68. On June 18, 2025, J.F. wired $642,000.00 to the Cathay Bank 3664 account (i.e., the account at Cathay Bank with the last four digits ending in 3664 and in the name of Great Lands of America LLC). The government seized defendant $488,275.57 from the Cathay Bank 3664 Account on or about August 21, 2025.

FIRST CLAIM FOR RELIEF

69. Plaintiff incorporates the allegations of paragraphs 1 through 68 above as though fully set forth herein.

70. Based on the facts set forth above, plaintiff United States of America alleges that the defendant bank funds constitute or are derived from proceeds traceable to violations of 18 U.S.C. § 1343 (wire fraud), which is a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1). The defendant bank funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). In addition, to the extent that the defendant bank funds are not the

actual monies directly traceable to the illegal activity identified herein, plaintiff alleges that the defendant bank funds are identical property found in the same account or place as the property involved in the specified offense, rendering the defendant bank funds subject to forfeiture pursuant to 18 U.S.C. § 984.

SECOND CLAIM FOR RELIEF

71. Plaintiff incorporates the allegations of paragraphs 1 through 68 above as though fully set forth herein.

72. Based on the facts set forth above, plaintiff United States of America alleges that the defendant bank funds constitute property involved in multiple transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and/or 1956(a)(1)(B)(i), or property traceable to such property, with the specified unlawful activity being a violation of 18 U.S.C. § 1343 (wire fraud). The defendant bank funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A). In addition, to the extent that the defendant bank funds are not the actual monies directly traceable to the illegal activity identified herein, plaintiff alleges that the defendant bank funds are identical property found in the same account or place as the property involved in the specified offense, rendering the defendant bank funds subject to forfeiture pursuant to 18 U.S.C. § 984.

THIRD CLAIM FOR RELIEF

73. Plaintiff incorporates the allegations of paragraphs 1 through 68 above as though fully set forth herein.

74. Based on the facts set forth above, plaintiff United States of America alleges that the defendant bank funds constitute property involved in multiple transactions or attempted transactions in

violation of 18 U.S.C. § 1957(a), or property traceable to such property, with the specified unlawful activity being a violation of 18 U.S.C. § 1343 (wire fraud). The defendant bank funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A). In addition, to the extent that the defendant bank funds are not the actual monies directly traceable to the illegal activity identified herein, plaintiff alleges that the defendant bank funds are identical property found in the same account or place as the property involved in the specified offense, rendering the defendant bank funds subject to forfeiture pursuant to 18 U.S.C. § 984.

FOURTH CLAIM FOR RELIEF

75. Plaintiff incorporates the allegations of paragraphs 1 through 68 above as though fully set forth herein.

76. Based on the facts set forth above, plaintiff United States of America alleges that the defendant bank funds constitute or are derived from proceeds traceable to violations of 18 U.S.C. § 1960 (illegal money transmitting business), which is a specified unlawful activity as defined in 18 U.S.C. § § 1956(c)(7)(A) and 1961(1)(B). The defendant bank funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). In addition, to the extent that the defendant bank funds are not the actual monies directly traceable to the illegal activity identified herein, plaintiff alleges that the defendant bank funds are identical property found in the same account or place as the property involved in the specified offense, rendering the defendant bank funds subject to forfeiture pursuant to 18 U.S.C. § 984.

FIFTH CLAIM FOR RELIEF

77. Plaintiff incorporates the allegations of paragraphs 1 through 68 above as though fully set forth herein.

78. Based on the facts set forth above, plaintiff United States of America alleges that the defendant bank funds constitute property involved in multiple transactions or attempted transactions in violation of 18 U.S.C. § 1960 (illegal money transmitting business), or property traceable to such property. The defendant bank funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A). In addition, to the extent that the defendant bank funds are not the actual monies directly traceable to the illegal activity identified herein, plaintiff alleges that the defendant bank funds are identical property found in the same account or place as the property involved in the specified offense, rendering the defendant bank funds subject to forfeiture pursuant to 18 U.S.C. § 984.

SIXTH CLAIM FOR RELIEF

79. Plaintiff incorporates the allegations of paragraphs 1 through 68 above as though fully set forth herein.

80. Based on the facts set forth above, plaintiff United States of America alleges that the defendant bank funds constitute property, or property traceable to property transported, transmitted, or transferred from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity in violation of 18 U.S.C. § 1956(a)(2)(A). The defendant bank funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A). In addition, to the extent that the defendant bank funds are not the

actual monies directly traceable to the illegal activity identified herein, plaintiff alleges that the defendant bank funds are identical property found in the same account or place as the property involved in the specified offense, rendering the defendant bank funds subject to forfeiture pursuant to 18 U.S.C. § 984.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff United States of America prays:

(a) that due process issue to enforce the forfeiture of the defendant bank funds;

(b) that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c) that this Court decree forfeiture of the defendant bank funds to the United States of America for disposition according to law; and

(d) for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: September 16, 2026

TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JENNIFER L. WAIER
Chief Assistant United States Attorney & Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture & Recovery Section

/s/
VICTOR A. RODGERS
Assistant United States Attorney
Asset Forfeiture & Recovery Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

VERIFICATION

I, Fred D. Apodaca, hereby declare that:

1. I am a Special Agent of the United States Secret Service.

2. I have read the above Verified Complaint for Forfeiture and know its contents.

3. The information contained in the Complaint is either known to me personally, was furnished to me by official government sources, or was obtained pursuant to subpoena. I am informed and believe that the allegations set out in the Complaint are true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 11, 2026 at Los Angeles California.

Fred Apodaca

Fred D. Apodaca
Special Agent
United States Secret Service